lIN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**GRADY MCDANIEL,**                                  Case No. 1:15 CV 1393

    Plaintiff,

    v.                                                  Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                                          MEMORANDUM OPINION AND ORDER


### INTRODUCTION

Plaintiff, Grady McDaniel ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 13). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in November 2011[1], alleging a disability onset date of June 29, 2011[2]. (Tr. 124). His claims were denied initially and upon reconsideration. (Tr. 140, 150). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 15-17).

---

1. Plaintiff previously applied for DIB and SSI in 2007, but was unsuccessful and his claim was denied in June 2011, with the appeals counsel denying request for review in October 2011. (Tr. 72-102, 103-08).

2. Plaintiff subsequently amended his alleged onset date to November 17, 2012. (Tr. 246).

Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on January 4, 2014. (Tr. 40-71). On March 10, 2014, the ALJ found Plaintiff not disabled. (Tr. 18-39). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-7); 20 C.F.R. §§ 404.955, 404.981. Plaintiff filed the instant action on July 14, 2015. (Doc. 1).

FACTUAL BACKGROUND

*Personal Background and Testimony*

Plaintiff was thirty-eight years old at his alleged onset date (Tr. 21) and had completed 11th grade. (Tr. 24). He was working toward his GED, but had not passed the required math test yet. (Tr. 49). He had attempted the test the prior year but had an "outburst" at the testing site and "stormed out." *Id.* At the time of the hearing, Plaintiff lived with his mother, and she drove him to the hearing. (Tr. 48-49). One of Plaintiff's sons periodically spends the night or stays for the weekend. (Tr. 49). Plaintiff was receiving food stamps at the time of the hearing, but also obtained money from family for cigars and marijuana when he was smoking. (Tr. 60-61).

Plaintiff testified he is able to drive, but currently does not have a license. *Id.* He was able to obtain a driver's license despite his congenital eye problems. *Id.* When there is something he "really ha[s] to read, that's important", he either reads it or has his mom read it. *Id.* He stated this is because his vision is sometime blurry and sometimes clear in the left eye. (Tr. 49, 56). Plaintiff has a prosthetic right eye due to a birth defect. (Tr. 509). He testified his vision prevents him from work requiring him to do anything "dealing with . . . [his] right side" and he lost a job as a lifeguard six years prior as a result. (Tr. 50). His vision is better with glasses. (Tr. 56-57).

Plaintiff testified he cannot work because of physical problems—sciatica and back issues—which require him to lie down during the day and because his medications cause him to

2

be sleepy. (Tr. 52). He also testified his mental problems limit his ability to work because he "can't accept authority"; is easily agitated; is easily distracted; and is "cranky" and "disrespectful". *Id.* He stated he was agitated at the hearing because he had not been on his medication in two weeks. *Id.*

Plaintiff stated he had no relief of his back pain from surgery, acupuncture or massage therapy. (Tr. 54-55). He estimated he could stand for ten to fifteen minutes before getting numbness shooting from his lower back to his toes. (Tr. 55). He estimated he can sit for about ten to fifteen minutes, but most of the time is laying down in a chair. *Id.* He uses a cane for standing, getting into the tub to shower, using the bathroom to sit down, and walking. (Tr. 55-56). He sleeps most of the day because of medication and "very seldom" watches television. *Id.*

Plaintiff testified his mental problems include depression, self-control problems, anger management problems, and social difficulties. (Tr. 57-58). He said he "feel[s] a little better about [him]self when [he] see[s his] counselor . . . [and] [s]he helps [him] a lot." *Id.* His medication "mellows [him] out a little bit." (Tr. 58). Plaintiff testified he and his mother "constantly battle", "[t]here's always an argument", and she is frightened of him. *Id.* He thinks about things from the past—such as a cousin who was murdered—and that will set him off or make him angry. (Tr. 59). He went to anger management counseling in the past for a few months. (Tr. 62).

Plaintiff testified he has thought about hurting himself. (Tr. 59). He stated his girlfriend lives on the sixth floor and there are times he has thought about jumping off her balcony. *Id.* When he was off his medication, he became violent and threatening and had to be taken to a psychiatric ward for a day. (Tr. 59-60).

Plaintiff was fired from a previous job for having outbursts. (Tr. 61-62).

3

*Medical Evidence Regarding Physical Impairments*[3]

Plaintiff has a long history of lower back pain pre-dating his alleged disability onset date. He underwent back surgery in August 2009 (a right hemilaminectomy, discectomy, partial foramintomy, and facetectomy at L5-S1). (Tr. 569-71). In September 2009, Plaintiff had an MRI of his lumbar spine. (Tr. 557). It showed a "previously demonstrated large subligamentous disc protrusion is no longer present" since surgery. *Id.* However, "a tiny central disc protrusion is now present at L5-S1", and "[a]nnual bulging and facet arthopaties narrow the neural exit foramina bilaterally at L4-5 and L5-S1 where moderately severe degenerative changes are noted in the intervertebral disc spaces." *Id.*

A thoracic spine x-ray at the emergency room in April 2010 showed "[n]o acute thoracic spine abnormality". (Tr. 554). A lumbar spine x-ray showed "[m]ild disc degenerative changes of L4-5 and L5-S1" and "[n]o acute abnormality." (Tr. 555).

A September 2010 MRI of the lumbar spine found "postoperative changes . . . compatible with right L5-S1 hemilaminectomy"; a "small paracentral disc protrusion . . . which results in mild effacement of the right S3 nerve within the lateral recess"; and "[s]hallow annular disc bulge and facet disease at L4-L5." (Tr. 543).

In November 2010, Dr. Linda Chun referred Plaintiff to massage therapy and acupuncture for "low back pain radiating to right leg" and "right leg paresthesias". (Tr. 421-23). Plaintiff reported a cortisone shot in his back decreased pain. *Id.* In December 2010, Dr. Mini B. Goddard performed an EMG and nerve condition study on Plaintiff. (Tr. 296). The results were

---

3. Plaintiff previously applied for, and was denied, benefits. (Tr. 72-102, 103-08). The ALJ here noted he "adopt[ed] the prior [ALJ]'s decision for the period of time through January 4, 2012" but that "[a]s of February 5, 2012, there is new and material evidence which documents that the claimant had severe impairments . . . . As a consequence, [the ALJ is] not adopting the findings of the prior decision in this case for any period of time from February 5, 2012." (Tr. 21-22).

"abnormal" and "suggestive of R S1 Radiculopathy." *Id.* In January 2011, Dr. Chun noted Plaintiff was using a TENS unit to help with his pain. (Tr. 346, 383).

In June 2011, Dr. Chun noted Plaintiff reported his back pain was the same and radiating down his leg, but medications help. (Tr. 355). He noted acupuncture was helpful and he had an upcoming massage. *Id.*

A July 2011 MRI of the lumbar spine showed "postsurgical changes post right hemilaminectomy at L5-S1 and "a persistent though smaller right paracentral disc protrusion which effaces the right lateral recess" and "[d]isc bulge and facet arthopathy at L4-5 without significant spinal canal stenosis or neural foraminal narrowing." (Tr. 530-31).

In August 2011, Plaintiff sought massage therapy for back pain. (Tr. 351-53). The massage therapist noted he reported improvement after and she observed he was walking better. (Tr. 352).

In September 2011, Dr. Sergio E. Souza at the Comprehensive Spine Center evaluated Plaintiff for complaints of returning low back and right leg pain. (Tr. 288-90). Plaintiff's gait was normal, but lumbar flexion was restricted secondary to pain, and lumbar extension, lateral bending, and rotation were about 20 degrees. (Tr. 289). Dr. Souza's impression was lumbar radiculopathy, postlaminectomy syndrome, lumbar region, and degeneration of lumbar or lumbosacral intervertebral disc. *Id.* Dr. Souza discussed lumbar epidural steroid injections, as well as alternative treatments. *Id.* Plaintiff reported the lumbar epidural steroid injections had helped him in the past and he would like to repeat them. *Id; see also* Tr. 293-94 (injections in December 2010).

In November 2011, Plaintiff went to the emergency room complaining of worsening back pain and asking for a referral to a pain specialist. (Tr. 461-63).

A June 2012 x-ray showed L5-S1 degenerative disc disease and mild scoliosis. (Tr. 687). A lumbar spine MRI that same month showed no evidence of arachnoiditis or recurrent disk protrusion or extrusion, as well as satisfactory right L5 laminotomy. (Tr. 688-90).

Notes from Dalbir Singh, MS, PA-C, in January 2013 showed Plaintiff's arm and leg strength were normal and symmetric, with no atrophy or tone abnormalities noted, but Plaintiff had pain to palpation over his lumbar paraspinal muscles. (Tr. 706-07).

In January 2013, physical therapist Karin Kleppel evaluated Plaintiff through the Cleveland Clinic's Return to Work Services Program. (Tr. 507-18). The physician listed is Dr. Benjamin Abraham. (Tr. 507). Plaintiff reported a constant pain level of 9/10. *Id*. He had good core and trunk muscle strength, but a decreased range of motion in his lumbar spine and slight decrease in right hip abduction strength. (Tr. 507-08). Ms. Kleppel noted Plaintiff "[r]efused to perform most functional tests and the ones he did perform, he scored below normal." (Tr. 508). His sitting tolerance was 14 minutes (on a mat, he refused to sit on a chair), "limited by length of testing"; standing and walking tolerance was 12 minutes "limited by length of testing and [Plaintiff's] behavior"; and lying tolerance was 39 minutes "limited by length of testing." *Id*. Plaintiff refused to perform many tests designed to test his ability to lift, carry, push or pull. *Id*.

Ms. Kleppel noted the reliability of Plaintiff's reports was "poor" and stated it was "impossible to . . . determine his functional capacity level" and he "verbally and physically contradicted himself several times during the test." *Id*. Plaintiff reported lying in his "lazy boy chair", but also that he goes to his girlfriend's house every day. (Tr. 509, 513). He reported being sexually active. (Tr. 509). He also reported seeing his sons "every week or two" and they "talk and play video games or go visiting their cousins together." (Tr. 510). Ms. Kleppel noted Plaintiff "continuously reported inability to walk distances or function in any physical capacity,

6

but when he returned from the rest room, he wanted to point out to me where he saw a spider earlier, and actually jogged, cane in hand, 15 – 20 feet to the spot of the spider." (Tr. 516). Ms. Kleppel found Plaintiff demonstrated normal strength in all four extremities, core and trunk, "which would be very hard to maintain while lying in bed all day, as he claims to be doing, due to pain." *Id.*

A July 2013 lumbar spine MRI showed "at L4-5, there is disc desiccation and loss of the intervertebral disc space"; "a large right paracentral disc extrusion with superior migration"; and "moderate to severe narrowing of the spinal canal". (Tr. 833).

Throughout his treatment for his back pain, Plaintiff was prescribed various pain medications, muscle relaxants, and anti-inflammatories. *See, e.g*., Tr. 288, 355, 441.

In addition to his back pain, Plaintiff has a prosthetic right eye due to a birth defect. (Tr. 328). He also complained of dizziness to Dr. Chen in September 2011 related to being kicked in the head during a robbery "a few years ago". (Tr. 346). Plaintiff also has a history of headaches and seizures and reported his last seizure was in 2005. (Tr. 347).

*Examining and Reviewing Physician Opinion*

Dr. Robert Whitehead examined Plaintiff for low back pain in January 2012 at the request of the state agency. (Tr. 440-42).[4] Plaintiff was living with a friend. (Tr. 441). He reported being able to sit for 30 minutes and stand for 30 minutes and could perform activities of daily living. (Tr. 440). Dr. Whitehead found he had uncorrected vision of 20/50 in his left eye. (Tr. 441). Dr. Whitehead noted Plaintiff "communicates without difficulty" and is "able to do without [his cane] during the exam and in walking about the room." *Id.* Dr. Whitehead found

---

4. The ALJ refers to this report as that of Jeff Vasiloff, M.D. (Tr. 31). This name confusion seems to arise from the fact that Dr. Whitehead's consultative examination report is addressed to Dr. Vasiloff at the Ohio Bureau of Disability Determination. (Tr. 440).

"restricted painful range of motion with myofascial tightness bilaterally" in the lumbar spine and "diffuse loss of sensation in a nondermatomal pattern throughout the entire right lower extremity". (Tr. 441-42, Tr. 446-47). A lumbar spine exam found "no significant degenerative changes of the lumbar spine." (Tr. 443). Dr. Whitehead concluded Plaintiff would "do best with jobs that allowed intermittent sitting and standing"; "would not be able to perform repetitive bending or lifting" and "would need a 10-15 pound lifting restriction." (Tr. 442).

Dr. Abraham Mikov examined Plaintiff's records in July 2012, and concluded Plaintiff could occasionally lift or carry 20 pounds; frequently lift or carry ten pounds; stand and/or walk for about six hours in an eight-hour work day; sit about six hours in an eight-hour work day; and push or pull in an unlimited manner. (Tr. 132). He concluded Plaintiff would be limited to occasional climbing of ladders, ropes, or scaffolds; and occasional stooping, kneeling, crouching, or crawling. *Id.* He opined Plaintiff "needs to be able to change sitting/standing positions [every] 30 minutes to relieve pain." *Id.* He also opined Plaintiff should avoid all exposure to hazards and commercial driving because of his serious vision problems. (Tr. 133-34).

Dr. Edmond Gardner reviewed Plaintiffs records in February 2012 and reached the same conclusions as Dr. Mikov. (Tr. 116-18).

### *Medical Evidence Regarding Mental Impairments*

In March 2011, Dr. Linda Chun, M.D. noted Plaintiff had a" [h]igh level of psychosocial stress" and assessed "[d]epressive disorder, not otherwise classified." (Tr. 371). Dr. Chun noted Plaintiff was stressed because his brother is about to be incarcerated. (Tr. 370).

In May 2012, Dr. Benjamin Abraham diagnosed Plaintiff with bipolar disorder and referred him to a psychiatrist. (Tr. 470-73). Dr. Abraham noted Plaintiff's self-provided history "certainly sounds like he has manic episodes". (Tr. 372).

8

Plaintiff began psychiatric treatment that same month at the Charak Center for Health and Wellness ("Charak Center"). (Tr. 995-1000). He primarily saw nurses ("RN"s) and licensed practical nurses ("LPN"s), but his treatment was supervised and signed off on by psychiatrists including Dr. Rakesh Ranjan. *See, e.g.*, Tr. 947, 952, 982, 986. He reported past suicidal and homicidal thoughts as well as difficulty controlling his anger, crying spells, and depression. (Tr. 997-98). The nurse who evaluated Plaintiff diagnosed him with bipolar disorder. (Tr. 1000). A note from later that month stated Plaintiff reported the prescribed medication, Seroqual XR, was "working great" for him with reduced aggression, irritability, and mood swings. (Tr. 991).

Plaintiff also began seeing a counselor at the Charak Center approximately once per week. (Tr. 784-801, 835-902). His counselor, LaToya N. Vaughn, LISW, noted they discussed Plaintiff's self-esteem and relationships (Tr. 901), and progress toward managing anger (Tr. 900). In July 2012, she noted Plaintiff was depressed due to lack of companionship and his physical health. (Tr. 896-97). He stated he feels "on edge". (Tr. 896). In August, Ms. Vaughn noted Plaintiff was depressed, irritable, and anxious. (Tr. 895). Many of the notes express Plaintiff experiences conflicts with his children's mother, *see, e.g.*, Tr. 892, and Plaintiff's desire for a relationship, *see, e.g.*, Tr. 892, 893, 895.

In September, Plaintiff's condition was reported to be "improving." (Tr. 986). In October he was "doing better" but had continued anxiety. (Tr. 983). Ms. Vaughn noted Plaintiff stated he had a better relationship with his children and his children's mother. (Tr. 898). In November, he was also assessed as "improving". (Tr. 982). A note from Ms. Vaughn in November states Plaintiff is "manic" and irritable. (Tr. 890). In December, he reported his mood was "leveling out", but he still had some situational anxiety. (Tr. 979). A December progress note also states Plaintiff "needs letter stating he is disabled and receiving treatment – sent to attorney" and "PS –

9

doing well on current meds – able to control emotions better." (Tr. 974). During this time, Ms. Vaughn continued to describe Plaintiff as irritable at times, (Tr. 881, 882), and depressed at others (Tr. 879, 881).

A January 2013 progress note states: "reports doing well on current meds". (Tr. 969). That same month, Ms. Vaughn, completed a "Medical Source Statement: Patient's Mental Capacity". (Tr. 523-24). This opinion was also signed by Dr. Ranjan in February 2013. (Tr. 524). Ms. Vaughn and Dr. Ranjan concluded Plaintiff would be able to occasionally[5]: follow work rules; use judgment; respond appropriately to changes in routine settings; maintain regular attendance and be punctual; deal with the public; function independently without redirection; understand, remember and carry out simple job instructions; socialize; behave in an emotionally stable manner; relate predictably in social situations; and manage funds and schedules. (Tr. 523-24). They also concluded Plaintiff could rarely[6]: maintain attention and concentration for extended periods of 2 hour segments; relate to co-workers; interact with supervisors; work in coordination with or proximity to others without being distracted or distracting; deal with work stress; complete a normal work day and work week without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and understand, remember and carry out detailed or complex job instructions." *Id.* Finally, they concluded Plaintiff could frequently[7]: maintain his appearance and leave home on his own. (Tr. 524). In support of this opinion, Ms. Vaughn noted: "Bipolar Disorder: easily irritated, difficulty managing anger" and a history of "impulsivity" and depression. *Id.*

---

5. "Occasional" is defined as "ability for activity exists for up to 1/3 of a work day." (Tr. 523).

6. "Rare" is defined as "activity cannot be performed for any appreciable time." (Tr. 523).

7. "Frequent" is defined as "ability for activity exists for up to 2/3 of a work day. (Tr. 523).

February 2013 notes from Ms. Vaughn indicate Plaintiff was "calm", and he had been "able to express [him]self without yelling" and had a good relationship with his girlfriend. (Tr. 849, 889). In April 2013, Plaintiff was stressed about his disability hearing, but "felt calm after speaking with [the clinician]". (Tr. 796-97). Ms. Vaughn described Plaintiff as irritable April and May of 2013 (Tr. 792, 793, 795-96), but also as "happy" in May 2013 because of his relationship with his girlfriend. (Tr. 794). Also in April, Plaintiff stated he was using exercise to cope. (Tr. 800). Later in May, Ms. Vaughn reported Plaintiff had racing thoughts and was stressed due to disrespect from his children's mother. (Tr. 793).

In June 2013, Plaintiff reported mood swings, anxiety, and irritability. (Tr. 964). His insurance had changed and he stated he could not afford his medication. *Id.* This same month, Plaintiff was involuntarily hospitalized by Dr. Ranjan due to threads of violence and suicidal thoughts. (Tr. 709-12, 732, 752-53). He reported not being able to afford, and therefore not taking, his medication. (Tr. 710). Hospital notes indicate he stated he had been out of control, throwing things, and screaming at his mother. *Id*. T. Williams, PC-CR performed a crisis assessment and noted Plaintiff was a threat to himself and others. (Tr. 756-62).

In July 2013, Ms. Vaughn noted Plaintiff's mood was improved and he had made progress since resuming medication. (Tr. 790). In August, Ms. Vaughn stated his mood was calm and thought process was insightful. (Tr. 789).

In October 2013, Plaintiff was noted to be "stable" (Tr. 965), and stated he was "feeling okay" with "no harmful thoughts", "denies hearing voices" and "no med side effects" (Tr. 962). In November, Plaintiff reported having broken up with his girlfriend, which caused mild anxiety and depression. (Tr. 953). He also reported his medications were working and making a difference. *Id.*

11

In November 2013, LaToya N. Hampton,[8] LISW, completed a second "Medical Source Statement: Patient's Mental Capacity". (Tr. 776-77). This opinion is also co-signed (but not dated) by Dr. Ranjan. (Tr. 777). The opinion states Plaintiff could occasionally: follow work rules; use judgment; maintain regular attendance and be punctual; function independently without redirection; understand, remember and carry out simple job instructions; behave in an emotionally stable manner; relate predictably in social situations; manage funds and schedules; and leave home on his own. (Tr. 776-77). They concluded Plaintiff could rarely: maintain attention and concentration for extended periods of 2-hour segments; respond appropriately to changes in routine settings; deal with the public; relate to coworkers; interact with supervisors; work in coordination with or proximity to others without being distracted or distracting; deal with work stress; complete a normal work day and work week without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; understand, remember and carry out complex or detailed job instructions; socialize; and relate predictably in social situations. *Id.* Finally, they concluded Plaintiff could frequently maintain his appearance. (Tr. 777). In support, Ms. Hampton noted: bipolar disorder, a history of depression, impulsivity, irritability, and difficulty managing anger. *Id.* She noted Plaintiff "becomes argumentative with others when stressed", has crying spells, and is "destructive when angry." *Id.*

In December 2013, notes from the Charak Center state Plaintiff was "still dealing with the breakup with his girlfriend" and his anxiety medication was not working. (Tr. 948). He reported being "on edge" and the "littlest thing sets him off", but "he works out a lot and that's a way for him to release stress." *Id.* The provider noted Plaintiff had moderate mood swings,

---

8. This second statement is signed by LaToya N. Hampton, LISW, but the signature appears similar to the first statement signed by LaToya N. Vaughn, suggesting a name change. (Tr. 777).

anxiety, and irritability. *Id.* This progress note is signed by Alex Novak, LPN, and Dr. Ranjan. (Tr. 952). Later in December, Plaintiff reported feeling better on a new medication, and things were good between him and his girlfriend. (Tr. 943). Notes from January 2014 are similar. (Tr. 933). In March and April, Plaintiff reported being upset because he was denied for disability and his girlfriend broke up with him. (Tr. 928, 923). Providers noted his mood swings, anxiety, and irritability were mild. (Tr. 923). Also in April, Plaintiff reported improvement on a new medication. (Tr. 918).

*Examining and Consultative Physician Opinions*

On January 5, 2012, Lari Meyer, Ph.D., examined Plaintiff at the request of the state agency. (Tr. 425-38). Dr. Meyer noted Plaintiff arrived early for his appointment, and reported he came via bus. (Tr. 426). He described symptoms of bipolar disorder and angry outbursts. (Tr. 427). He reported currently living with a friend, and getting along with his two youngest children. (Tr. 429). He said he spent most of his day lying down watching television or listening to music, as well as playing video games at times. (Tr. 430). Dr. Meyer noted Plaintiff's "behavioral presentation is notable for being somewhat dramatic" and "symptom exaggeration should be considered based on reported and endorsed symptomatology." (Tr. 431). Dr. Meyer noted Plaintiff reported hearing voices and experiencing paranoid ideation, but there were no clinical signs of psychosis. (Tr. 432). Dr. Meyer noted Plaintiff's IQ score of 76 places him in the borderline range of intellectual functioning, but his scaled score range of 5-12 suggests possibly higher levels of functioning. (Tr. 434). Dr. Meyer diagnosed borderline intellectual functioning; and noted Plaintiff "did not demonstrate any clinical signs of depression, anxiety, mania/hypomania, hallucinatory experiences, or post traumatic revivification experiences during the examination." (Tr. 435). Dr. Meyer opined Plaintiff would be able to: understand, remember,

13

and follow simple instructions; maintain attention, concentration, persistence and pace to complete a basic task; relate to others on a simple level only on a time-limited basis; and be able to respond appropriately to simple, rote, and repetitive work tasks. (Tr. 436-37).

On January 12, 2012, Dr. Caroline Lewin reviewed Plaintiff's records and concluded Plaintiff was not significantly limited in his ability to remember locations and work procedures; ability to understand and remember short and simple instructions; ability to accept instructions and respond appropriately to criticism from supervisors (Tr. 119). Dr. Lewin concluded Plaintiff was moderately limited in his ability to understand and remember detailed instructions because of his borderline intelligence. *Id.* She also found him to be moderately limited in the ability to interact appropriately with the general public; and to get along with coworkers and respond appropriately to supervisors. (Tr. 119-20). She considered his "history of conflicts" and prior firing for "attitude", but contrasted these with his ability to "stay with a friend", "get others to give him rides", and "see his two younger children." (Tr. 120). Dr. Lewin concluded Plaintiff "should be able to handle simple instructions in a routine low stress work setting where persistence needed is short term and relating is minimized or superficial." *Id.*

Dr. Mel Zwissler, Ph.D., reviewed Plaintiff's records for the state agency in July 2012, and agreed with Dr. Lewin's conclusions. (Tr. 135).

### VE Testimony and ALJ Decision

A VE testified at the ALJ hearing. (Tr. 63-70). The ALJ first asked the VE to consider a hypothetical individual with Plaintiff's age, education and vocational background who is:

> Limited to lifting, carrying, pushing or pulling. . . 20 pounds occasionally, and ten pounds frequently. . . . [N]o ladders, ropes or scaffolds. The person is limited to occasional use of ramps and stairs. And that person can occasionally stoop, kneel, crouch or crawl. That person . . . is blind in his right eye, and his field of vision is limited accordingly. Therefore, that person must avoid all exposure to hazards such as unprotected heights or working around unprotected moving machinery. The hypothetical person cannot engage

in commercial driving. This person is limited to simple instructions in a routine, low stress work setting where persistence needed is short term. And he can relate to others on a superficial basis. That person is further limited in relating to others occasionally. The person retains the ability to concentrate and complete simple, SVP: 1 and 2 tasks.

(Tr. 66-67). The VE testified such an individual could work as a wire worker, electronics worker, or assembly press operator. (Tr. 67). The VE testified that adding a limitation that the person use a cane for ambulation only would not change his answer. (Tr. 68). However, if the person required the cane for ambulation and standing, the listed jobs would be ruled out. *Id.* A limitation preventing repetitive bending or lifting would not rule out the jobs listed by the VE. *Id.*

The ALJ then asked the VE to again consider the first hypothetical, but add a limitation to sedentary work, a sit/stand option, and no repetitive bending or lifting. (Tr. 68). The VE stated jobs such as table worker, bench hand, or final assembler would be available to such an individual. (Tr. 69). In response to a question from Plaintiff's counsel, the VE opined if the hypothetical individual had repeated angry outbursts, there would be no jobs available. (Tr. 69-70). The VE also testified if a person was off task more than ten percent of the time outside of regular breaks, such a person would be replaced. (Tr. 70).

In his written decision, ALJ concluded Plaintiff had not engaged in substantial gainful activity since his application date (Tr. 23), and had severe impairments of

congenital right eye disorder, history of seizure disorder, S/P L5-S1 on the right and right hemilaminectomy, discectomy, partial foraminotomy and facetectomy at the L5-S1 on the right, and rule out impulse control disorder; depression, anxiety, degenerative joint disease, arthritis of the back, depressive disorder and bipolar disorder, blind right eye since birth, mood disorder not otherwise specified, and borderline intellectual functioning.

(Tr. 24). He concluded these impairments did not meet or equal the listings and Plaintiff retained the RFC for

[l]ight work as defined in 20 CFR 416.967(b), limited to lifting, carrying, pushing or pulling 20 pounds occasionally, 10 pounds frequently; with the ability to stand

15

and/or walk 6 hours in an 8 hour work day; with the ability to sit about 6 hours in an 8 hour work day; with unlimited push and/or pull; with the ability to occasionally climb ramps and stairs; precluded from climbing of ladders, ropes, and scaffolds; with the ability to occasionally stoop; with the ability to occasionally kneel . . . crouch . . . [or crawl]; precluded from all exposure to hazards such as unprotected heights or working around unprotected moving machinery; precluded from commercial driving; limited to simple instructions in a routine low stress work setting where persistence needed is short term and relating to others is superficial and occasional; with the ability to concentrate to complete simple SVP level 2 tasks; and with a requirement that the claimant utilize a cane for ambulation only.

(Tr. 27). Based on the VE's testimony, the ALJ concluded Plaintiff could perform work in the national economy and therefore was not disabled. (Tr. 33-34).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

4.  Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

17

**DISCUSSION**

Plaintiff raises two related objections to the ALJ's decision: 1) the ALJ's RFC does not reflect Plaintiff's limitations because the ALJ failed to properly weigh the opinions of Plaintiff's treating physicians—both regarding his physical and mental impairments; and 2) the ALJ erred in his RFC assessment by excluding a sit/stand limitation. (Doc. 16). The Commissioner responds: 1) the ALJ properly weighed the treating physician opinions; and 2) the RFC finding is supported by substantial evidence, and even if not, is harmless error. (Doc. 19).

***Treating Physicians***

Plaintiff's first argument implicates the well-known treating physician rule. Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

A treating physician's opinion is given "controlling weight" if it is supported by (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give

18

"good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544.

When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011); *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009).

An ALJ's failure to explicitly evaluate and give weight to a treating physician's opinion may be harmless error in three situations: 1) where the treating physician's opinion "is so patently deficient that the Commissioner could not possibly credit it"; 2) where the Commissioner adopts the opinion of the treating source or makes findings consistent with that opinion; or 3) where the Commissioner has met the goal of giving "good reasons" even though he has not directly addressed the opinion. *Wilson*, 378 F.3d at 547.

*Dr. Ranjan*

Plaintiff first argues the ALJ erred in failing give "good reasons" for discounting to the opinion of his treating psychiatrist, Dr. Ranjan. (Doc. 16, at 14). The Commissioner responds Dr. Ranjan's opinions were not entitled to deference because they are "check-box opinions that

contain no supporting narrative discussion" or, alternatively, the ALJ adequately considered the opinions. (Doc. 19, at 5-7).

As an initial matter, the undersigned notes the functional capacity assessments at issue appear to have been completed by Ms. Vaughn[9], LISW, and co-signed by Dr. Ranjan. (Tr. 524, 777). A "team" opinion signed by both a non-acceptable medical source and a physician qualifies as a treating physician's opinion and is entitled to deference "when there is evidence demonstrating that the statement presented to the ALJ represented the opinions of a team effort, or that the medical facility used a team approach to a claimant's . . . treatment." *Borden v. Comm'r of Soc. Sec.*, 2014 WL 7335176, at *9 n.2 (N.D. Ohio). The parties do not dispute, and undersigned finds such evidence here. Dr. Ranjan and Ms. Vaughn worked in the same practice—Charak Center—and Dr. Ranjan signed many of Plaintiff's progress notes. Therefore, these opinions are entitled to application of the treating physician doctrine.

It is unclear here if the ALJ recognized the opinions were entitled to application of the treating physician doctrine, as he discussed both opinions as those of the social worker, not Dr. Ranjan. *See* Tr. 30. It does not matter, however, because the ALJ's discussion satisfies the "good reasons" requirement.

An "exhaustive factor-by-factor analysis" regarding a treating physician's opinion is not required, *see Francis*, 414 F. App'x at 804-05, and reasons given for the weight given to a treating physician's opinion may be brief, *see Nejat v. Comm'r of Soc. Sec.,* 359 F. App'x 574, 578 (6th Cir. 2009) (finding an ALJ "provided sufficient reasons . . . [t]hough brief," for rejecting treating physician's opinion). The ALJ here addressed the supportability of the opinion and consistency with the record—specifically with the opining physician and social worker's

---

9.  Also known as Ms. Hampton. *See supra* at n.8.

own treatment notes. *See Henke v. Astrue*, 498 F. App'x 636, 640 n.3 (7th Cir. 2012) (finding that express consideration of supportability and consistency is sufficient); *Bennemann v. Comm'r of Soc. Sec.* 2012 WL 5384974, at *1 (N.D. Ohio) (same).

The ALJ discussed both the January 2013 and November 2013 functional capacity assessments and gave them "little weight" because he found they were contradicted by progress notes from the Charak Center during the same time period.[10] *Id.* The ALJ noted Dr. Ranjan reviewed progress notes from a December 2013 visit which showed "logical thought process, full affect, average intelligence estimate, orientation for person and situation, intact reasoning ability, average insight, fair judgment, normal impulse control, although he had a compulsion for handwashing." (Tr. 30 (citing Tr. 824-28)). The ALJ also commented that, during this time period, Plaintiff's "primary problem was dealing with the breakup of a girlfriend." (Tr. 30 (citing Tr. 814, 824 (progress notes from November and December 2013 signed off on by Dr. Ranjan))). The ALJ noted in May 2013, Plaintiff reported being happy with his relationship. (Tr. 30 (citing Tr. 794 (progress note from Ms. Vaughn)).

Additionally, in the next paragraph, the ALJ pointed to an August 2013 note from Ms. Vaughn that Plaintiff had made progress since resuming medications. (Tr. 30, citing Tr. 790)). This visit note states his mood is notably improved. (Tr. 790). Furthermore, the ALJ cited a December 2013 visit with Ms. Hampton in which she noted his new medication worked well and things were going well with his new girlfriend. (Tr. 30-31 (citing Tr. 784)).

A review of the record shows the ALJ's reasons for discounting Dr. Ranjan's opinion were a reasonable basis for rejecting the extreme limitations in the opinion. The records cited by

---

10. For this reason, the undersigned declines to adopt the Commissioner's argument that the opinions were properly rejected because of their cursory, or "check box" nature. *See* Doc. 19, at 5-6. The ALJ here did not identify that as a reason for rejecting the opinions, and, in fact, discussed them in detail. *See* Tr. 30.

the ALJ in support of his decision to give these opinions "little weight" show Plaintiff's mental condition improved with treatment, and was not as limiting as Ms. Vaughn and Dr. Ranjan's statement suggested. For example, elsewhere in his opinion, the ALJ describes Plaintiff's daily living activities as "moderately restricted" as he takes care of himself, took a bus to a consultative examination, and visited with his girlfriend and sons. (Tr. 25). He also noted with regard to social functioning that Plaintiff "maintains satisfactory relationships with his relatives as well as his girlfriend".  (Tr. 26). The reasons given by the ALJ—as a whole, and in the context of the record as a whole—are "sufficiently specific to make clear" to this reviewer "the weight given to the treating physician's opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544. Therefore, the "good reasons" requirement is satisfied, and the ALJ's decision is supported by substantial evidence in this regard.[11]

*Treating Physicians Regarding Physical Impairments*

Plaintiff contends the ALJ erred in "discount[ing] the treating physicians' opinions regarding the severity of his back condition, as a host of objective medical testing results

---

11. Plaintiff also objects to the ALJ "stripp[ing] . . . all evidentiary weight" documentation from a social worker during Plaintiff's hospitalization for mental problems. (Doc. 16, at 14). Based on the record citations provided, Plaintiff appears to be referring to a "Crisis Assessment" filled out by T. Williams, PC-CR during that hospitalization which states Plaintiff is a danger to himself or others. *See* Tr. 709-12, 752-62. The ALJ noted the statement appeared to come from a non-acceptable medical source. (Tr. 30). Plaintiff argues that "the ALJ also completely ignored the medical assessment of Dr. Ranjan, whose opinion was nearly identical to the social worker, assessing that Mr. McDaniel was a suicide risk and liable to commit acts of violence, therefore wishing to hospitalize him." (Doc. 16, at 14). Rather than ignoring this evidence, however, the ALJ explicitly considered it and noted it "support[s] a finding that the claimant requires continued treatment and that such treatment permits relatively good control of his condition." (Tr. 30). The ALJ did not discount that Plaintiff had a serious problem at the time of his hospitalization, but he reasonably noted that this occurred because Plaintiff had not been on his medication, and concluded the hospitalization report was evidence that continued treatment was required. (Tr. 30). Other record evidence supports this conclusion. *See, e.g.*, Tr. 790 (note from Ms. Vaughn stating Plaintiff's had made progress since resuming medication). The undersigned therefore finds the ALJ's decision supported by substantial evidence in this regard.

corroborate their assessments." (Doc. 16, at 15). The Commissioner responds that "there is no treating physical physician opinion in the record." (Doc. 19, at 8).

The Commissioner is correct that the ALJ is only required, under the regulations, to assign weight and give good reasons for discounting a treating source's *opinion*. *See* 20 C.F.R. § 404.1527(a)(2) ("[m]edical opinions are statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical and mental restrictions."); 20 C.F.R. § 404.1513 (noting that medical reports "should include" *inter alia*, "[a] statement about what you can still do despite your impairment(s) based on the acceptable medical source's findings [including history, clinical and laboratory findings, and treatment response].").

Plaintiff points to records from treating physicians, but none that offered an *opinion* regarding how Plaintiff's physical limitations would affect his ability to work. *See Bass v. McMahon*, 499 F.3d 506, 510 (6th Cir. 2008) (noting that "observations, without more, are not the type of information from a treating physician which will be provided great weight under 20 C.F.R. § 404.1513"). Rather, Plaintiff seems to takes issue with the ALJ's weighing of the evidence.

It is the duty of the ALJ to weigh and resolve conflicts in the medical evidence. *Richardson v. Perales*, 402 U.S. 389, 399 (1971). The ALJ here thoroughly reviewed the medical evidence—including records, x-rays, and MRIs—from Plaintiff's treating physicians. *See* Tr. 25, 28-32. The ALJ pointed to inconsistencies in the record, credibility issues, and the opinions of state agency physicians in reaching his final determination about Plaintiff's RFC.

First, in his listing discussion, the ALJ noted that despite x-rays showing degenerative disc disease and scoliosis, Plaintiff had normal range of motion, reported being sexually active, and reported using exercise to cope with stress. (Tr. 25, citing Tr. 724, 723, 800).[12] The ALJ also discussed these findings again in his RFC analysis. (Tr. 30). Second, the ALJ discussed Plaintiff's repeated reports of a high pain level and inability to perform many physical functions, but that these reports were contradicted by other evidence of record. (Tr. 28-29). For example, the ALJ pointed to Ms. Kleppel's notes that Plaintiff: 1) reported inability to walk distances, but that Ms. Kleppel observed him to jog, cane in hand, 15-20 feet (Tr. 29, 516); 2) stated he lay down all day, but that this was contradicted by normal strength in all extremities, core, and trunk (Tr. 29, 516); and 3) stated he lay down all day, but also reported he went to his girlfriend's apartment every day and saw his sons every week or two (Tr. 29, citing 509-10, 513).

The ALJ noted these apparent exaggerations decreased Plaintiff's credibility and suggested his back problems were not as limiting as he claimed. (Tr. 29). Discounting credibility to a certain degree is appropriate when the ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence. *Walters*, 127 F.3d at 531. The Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [Claimant's testimony] are reasonable and supported by substantial evidence in the record." *Jones*, 336 F.3d at 476. The ALJ here pointed to specific inconsistencies between Plaintiff's statements to physicians and the observations those same physicians made of Plaintiff. *See, e.g.*, Tr. 29 (citing Tr. 509-10, 513, 516). He also, earlier in the opinion, discussed Plaintiff's daily activities— noting he was "independent in activities of daily living", "took a bus to a consultative examination" and "went almost daily to his girlfriend's apartment." (Tr. 25); *see Walters*, 127

---

12. The undersigned also notes Plaintiff reported to a Charak Center provider in December 2013 that he "works out a lot." (Tr. 948).

F.3d at 532 (noting an ALJ may consider daily activities in considering Plaintiff's assertions of pain).

It was not error, in context, for the ALJ to give the "greatest weight" to state agency physician Dr. Mikov, and "some weight" to the report from Dr. Whitehead[13]. First, these were the only sources of opinion evidence in the record. Second, state agency physicians are "highly qualified physicians and psychologists who are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(e)(2)(i); *see also Douglas v. Comm'r of Soc. Sec.*, 832 F. Supp. 2d 813, 823-24 (S.D. Ohio 2011). The ALJ appropriately considered these opinions and weighed them against the evidence in the record (as discussed above) in determining Plaintiff's RFC.

Although Plaintiff argues the reasons given by the ALJ do not "hold[] much evidentiary weight in comparison to the various x-rays, EMGs, and MRIs of [Plaintiff's] back that corroborate the opinions of his treating physicians," (Doc. 16, at 16), the undersigned's review is limited to whether the ALJ's decision is supported by substantial evidence, *Walters*, 127 F.3d at 528. While the studies, imaging, and physician records certainly show that Plaintiff has ongoing back problems, the undersigned finds the ALJ reasonably considered contradicting evidence that Plaintiff's self-reported symptoms and abilities were not as exaggerated as Plaintiff claimed, and there were internal conflicts in the record. This provides the required substantial evidence for the ALJ's decision regarding Plaintiff's physical limitations.

### RFC Determination

Plaintiff's second argument is the ALJ failed to include a sit/stand option in his RFC, despite giving the opinion Dr. Mikov—who expressed such a limitation was necessary—the

---

13. Again, the ALJ refers to this report as authored by Dr. Vasiloff. (Tr. 31).

greatest weight. (Doc. 16, at 17). The Commissioner responds that the ALJ's determination was supported by substantial evidence, and even if not, it is harmless error. (Doc. 19, at 9). As discussed below, the undersigned agrees with the Commissioner.

First, Plaintiff is correct that the ALJ gave Dr. Mikov's opinion the "greatest weight" of any medical opinion, but failed to mention Dr. Mikov's restriction of a sit/stand option. (Tr. 32). However, an ALJ is not required to adopt all limitations in a particular opinion, even one to which he assigns "great weight". *See Smith v. Colvin*, 2013 WL 6504681, at *11 (N.D. Ohio) (finding an ALJ who attributes "great weight" to state-reviewing psychologist opinions not required to include in claimant's RFC all limitations assessed by them). The responsibility for determining a claimant's RFC "rests with the ALJ, not a physician." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)).

Although the ALJ here stated he was giving the "greatest weight" to Dr. Mikov's opinion, he did not state he was adopting that opinion *in toto*. (Tr. 32). The ALJ's decision indicated he thoroughly considered the medical evidence and the extent to which he found Plaintiff's subjective complaints about his back pain not fully credible. *See, e.g.* Tr. 29 (citing Tr. 516) (summarizing Plaintiff's reported inability to function physically and contrasting with his ability to "jog, cane in hand, for 15-20 feet"); *see also supra* at 24 (discussing ALJ's credibility determination). The ALJ's decision not to include the sit/stand option in the RFC is therefore reasonable and supported by substantial evidence. *See Roy v. Comm'r of Soc. Sec.*, 2015 WL 1286398, at *4 (S.D. Ohio) (finding it is not error to exclude a restriction from an examining physician's opinion, even when that opinion was given "significant weight").

Second, the undersigned agrees with the Commissioner that even if this were error, it is harmless under the circumstances. At the end of the hearing, the ALJ asked the VE to modify his

26

hypothetical individual to include "a sit/stand option that would allow the person to intermittently sit or stand." (Tr. 68). In response, the VE gave examples of several jobs available to such an individual. (Tr. 69). Thus, Plaintiff cannot show prejudice from the ALJ's decision not to include the sit/stand option in his final RFC, because the outcome would not have been different. *See Rabbers,* 582 F.3d at 654 ("If an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.").

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB and SSI is supported by substantial evidence, and therefore affirms the Commissioner's decision.

 s/James R. Knepp II
United States Magistrate Judge